UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| GEORGE HALDES, | ) | No. 12 B 20050 |
| | ) | |
| Debtor. | ) | Judge Janet S. Baer |

MEMORANDUM OPINION

George Haldes ("Debtor") objects to proof of claim number 20, in the amount of $1,964,772.32, held by Burling Dickens Sheffield Real Estate Investors, LLC ("Burling Dickens"). Burling Dickens holds a promissory note (the "Note") in the original principal amount of $1,718,148.50 secured by a senior mortgage against Debtor's residence located at 2540 North Burling in Chicago (the "Burling Property"). Neither party disputes the oversecured status of Burling Dickens's claim. However, the parties dispute the amount of post-petition, pre-confirmation interest due to Burling Dickens. Debtor argues that Burling Dickens is entitled to collect interest only at the Note's pre-default rate of 6.25 percent, whereas Burling Dickens argues that it is entitled to interest at the Note's default rate of 16.25 percent. For the reasons set forth below, the Court sustains Debtor's objection, in part, and determines the appropriate default interest rate to be 10.25 percent (an additional 4 percent above the pre-default contract rate).

**Jurisdiction**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

1

## Background

On May 16, 2012, Debtor filed a voluntary chapter 11 case.[1] Debtor is a real estate developer and property manager who owns and operates several commercial and residential buildings in Illinois. At the time the petition was filed, Debtor was indebted to Burling Dickens's predecessor in interest, Bridgeview Bank Group ("Bridgeview"), under the terms of the Note dated April 23, 2010. The Note was secured by mortgage liens on the Burling Property and another property located at 1841 North Sheffield in Chicago (the "Sheffield Property"). The Note provides for an interest rate of 6.25 percent and a maturity date of April 23, 2012. It also provides for a late charge of 5 percent for any delinquent amount, as well as the recovery of attorneys' fees and other costs in connection with any enforcement action. Finally, the Note provides the following with respect to "default interest":

> INTEREST AFTER DEFAULT. Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding a 10.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. After maturity, or after this Note would have matured had there been no default, the Default Rate Margin will continue to apply to the final interest rate described in this Note. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

Under the Note, Debtor and his wife were required to make monthly installment payments until the maturity date. They defaulted on their obligations when they failed to make the full monthly payment due February 23, 2012. The Note matured on April 23, 2012, at which point the entire outstanding balance became due and payable. Debtor was unable to renew, repay, or refinance his secured mortgage debt. This, along with the imminent foreclosure on one of his commercial properties and the declining real estate market, precipitated his filing for bankruptcy relief.

---

[1] The Court takes judicial notice of the docket in this case, including all documents and pleadings filed, all orders entered, and all arguments made at the hearings held before the Court during the pendency of this case. *See In re Salem*, 465 F.3d 767, 771 (7th Cir. 2006). Unless otherwise noted, all statutory and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532, and the Federal Rules of Bankruptcy Procedure.

On August 3, 2012, Bridgeview filed a motion seeking, among other things, relief from the automatic stay (the "Bridgeview Motion"). The central issue was whether Bridgeview was adequately protected by an equity cushion in the Burling Property and the Sheffield Property. After conducting an evidentiary hearing, the Court denied the Bridgeview Motion without prejudice. On February 12, 2013, Bridgeview filed a renewed motion for relief from the automatic stay. The Court scheduled a hearing on the motion, which was continued several times and eventually rendered moot by the confirmation of Debtor's Sixth Amended Plan of Reorganization (the "Plan").

On April 30, 2013, the Debtor sold the Sheffield Property pursuant to an order approving the sale entered by this Court. On May 6, 2013, Bridgeview assigned its claim to Burling Dickens. Burling Dickens received $401,528.06 from the sale of the Sheffield Property pursuant to its secured claim.

On May 24, 2013, Debtor filed the instant objection to Burling Dickens's proof of claim (the "Objection"). The Objection was pending when the Court held a hearing on confirmation of the Plan. On September 16, 2013, the Court confirmed the Plan without resolution of the Objection. The Plan provides for payment in full of all allowed unsecured claims. The Plan also requires Debtor to make ongoing monthly payments of principal and interest to Burling Dickens at the rate of 5 percent amortized over thirty years. In addition, it requires Debtor to list the Burling Property for sale for no more than $3,250,000 and to continue to market the Burling Property actively. In the event Debtor fails to make a payment, or fails to sell the Burling Property by September 30, 2014, Debtor is to auction the Burling Property pursuant to bid procedures attached to the Plan. ECF Nos. 345, 372. The confirmation order contained the following statement regarding the effective date of the Plan and Debtor's payment obligations to

Burling Dickens: "The effective date of the Plan with respect to [Burling Dickens] shall be September 16, 2013. The amount of Debtor's payment obligations to [Burling Dickens] shall be amended by the Court's order on the Debtor's objection to [Burling Dickens]'s Claim . . ., which is set for hearing on September 25, 2013 at 10:30 a.m." Order Confirming Plan, ECF No. 398.

The Court held a hearing on the Objection on September 25, 2013. Burling Dickens introduced evidence, through the testimony of Keith Bierman ("Bierman"), regarding the "reasonableness of the default interest charges that are provided for in the note." Hr'g Tr. 24:10–11, Sept. 25, 2013. Bierman testified to his general knowledge that other banks in 2010 were charging between 4 percent and 15 percent in default interest on commercial real estate loans in Illinois. He offered testimony that the default rate of interest is intended, in part, to cover unforeseeable costs and risks associated with having a borrower in default, such as costs of actively monitoring the collateral, monitoring and participating in litigation, and complying with additional regulatory burdens imposed with regard to non-performing loans, as well as the additional risk of losses associated with a non-performing loan. Hr'g Tr. 31:10–33:7; Bierman Aff. ¶ 4. Bierman also testified generally about the process of establishing default rates of interest, as follows:

> Q   In your experience, what is the standard default rate for a loan such as this in Illinois?
>
> A   I think I touched on this a little bit before. I've provided a range of, you know, 4 to 15 percent. And, again, in my experience, when a borrower goes to a lender and asks for a loan, there's usually a standard default interest rate that is proposed. And then there's a negotiation process. Oftentimes, that occurs, depending on the circumstances of the loan, who the borrower is, what the asset that's being lent on is, the collateral and those types of things. I've seen—I've looked at a case recently where the rate was 4 percent. But it was a different type of case. I've looked at cases where it was an 18 percent default rate. So there definitely is a range as far as, again, what I have seen in Illinois.

4

Hr'g Tr. 33:8–24. There was no evidence, however, that the default interest rate was actually negotiated in this case. See Hr'g Tr. 44:22–25; 48:11–14; 54:6–14. Bierman concluded that a 10 percent default interest rate was "not unreasonable, especially if it was agreed to by the parties . . . with full knowledge of the terms of the loan." Hr'g Tr. 35:18–21. He opined that late charges alone did not sufficiently cover the risks and costs associated with a non-performing loan. Hr'g Tr. 32:10–12; 39:5–7.

During the life of the loan, Debtor incurred $84,938.36 in late charges. Hermes Aff. ¶ 19. From February 26, 2012 to May 21, 2013, regular interest accrued in the amount of $128,546.45, while default interest accrued in the amount of $205,674.32. Hermes Aff. ¶¶ 14, 18. From May 21, 2013 to confirmation, regular and default interest continued to accrue at the rates of $270.99 and $433.58 per day, respectively. Hermes Aff. ¶ 18. Burling Dickens's attorneys' fees exceed $74,000. Hermes Aff. ¶ 20. Of the foregoing amounts, only the default interest is in dispute.

## Discussion

As a general rule, creditors in a bankruptcy case are not entitled to receive interest that accrues post-petition. See 11 U.S.C. § 502(b)(2) (disallowing any claim for "unmatured interest"). Section 506(b) creates an exception to that general rule, permitting creditors with oversecured claims to receive interest on their claims, "and any reasonable fees, costs, or charges provided for under the agreement." 11 U.S.C. § 506(b);[2] United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989). Courts are divided about whether a contract default rate of interest is binding or whether bankruptcy courts may examine the reasonableness of a contract default rate

---

[2] Section 506(b) provides, in relevant part:

> To the extent that an allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement . . . .

11 U.S.C § 506(b).

5

of interest. *See* 4 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 506.04[2][b][ii] at 506-104 (16th rev. ed. 2013) (stating that "[i]n general, a default rate of interest is properly a form of interest"); *but see In re AE Hotel Venture*, 321 B.R. 209, 215 (Bankr. N.D. Ill. 2005) ("Default interest . . . is not true interest at all. It is a form of late charge and thus is a "charge" for purposes of section 506(b)."), and *In re Consol. Props. Ltd. P'ship*, 152 B.R. 452, 456 (Bankr. D. Md. 1993) ("Default rates of interest should be treated similarly to late charges and examined for reasonableness by bankruptcy courts. Merely because a creditor fashioned its protection and compensation in the form of an increased default rate of interest under an agreement, it should not escape a reasonableness inquiry . . . .").

This Court agrees with a reading of § 506(b) that allows default rates of interest to be reviewed for reasonableness. Because the "Default Rate Margin" in the Note can be characterized as a "charge" under applicable nonbankruptcy law, it may be reviewed for reasonableness as a "charge" under § 506(b). *See AE Hotel Venture*, 321 B.R. at 216. The "Default Rate Margin" is not "a 'reasonable' charge . . . if it compensates for an injury that has already been compensated in some other way under the parties' agreement." *Id.*

Analysis of default interest rates is based on the facts and circumstances of each case. *See Ron Pair*, 489 U.S. 235; *Consol. Props. Ltd. P'ship*, 152 B.R. at 457. There is a presumption in favor of the contract default rate of interest. *See In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994). That presumption, however, is rebuttable and has been rebutted in cases in which the contract rate was significantly higher than the pre-default rate without any justification offered for the spread. *Id.* For example, in *Consolidated Properties*, a second lien claimant objected to the proof of claim filed by oversecured creditor Citibank. *Consol. Props. Ltd. P'ship*, 152 B.R. at 453. Citibank filed a claim that included post-petition interest at the default rate, late charges,

6

and attorneys' fees. *Id.* The court refused to award interest based on the contract default rate when that rate, 18.75 percent, represented a 36 percent increase over the pre-default rate of 13.75 percent. *Id.* at 453, 458. The court held that it was not reasonable to allow Citibank a secured claim for default interest in addition to late charges that were 5 percent of the aggregate principal balance. *Id.* at 458. The base contract rate of 13.75 percent was adequate compensation to Citibank for the time value of the principal balance of the loan. *Id.* Other courts have reached similar results, holding default rates of interest to be unreasonable based on the equities of the case. *See, e.g., In re Boardwalk Partners*, 171 B.R. 87 (Bankr. D. Ariz. 1994); *In re Timberline Prop. Dev., Inc.*, 136 B.R. 382 (Bankr. D.N.J. 1992); *In re Hollstrom*, 133 B.R. 535 (Bankr. D. Colo. 1991); *but see In re Courtland Estates Corp.*, 144 B.R. 5, 9 (Bankr. D. Mass. 1992) (awarding creditor default interest based on the contract rate after the creditor submitted evidence showing that the contract rate of 18 percent was within the range of default rates charged at the relevant time).

The presumption in favor of the contract default rate of interest has been sufficiently rebutted in this case. The "Default Rate Margin" is 10 percent. When added to the 6.25 percent interest rate on the Note, the result is a default interest rate of 16.25 percent—a 160 percent increase over the pre-default rate.[3] In addition, Burling Dickens is claiming late charges totaling $84,938.36 and attorneys' fees in excess of $74,000. Based on a default rate that is significantly higher than the pre-default rate, in addition to the amount of late charges and attorneys' fees that Burling Dickens will be awarded in connection with its secured claim, the Court finds that the presumption in favor of the contractual default rate of interest has been rebutted.

Once rebutted, the burden shifts to Burling Dickens to show that the contract default rate of interest is reasonable. *See In re Olde Prairie Block Owner, LLC*, 452 B.R. 687, 695 (Bankr.

---

[3] $16.25 \div 6.25 - 1 = 1.6$.

7

N.D. Ill. 2011). Burling Dickens has tried to justify the large spread between the pre- and post-default rates. It submitted evidence, through Bierman, purportedly showing that the 16.25 percent default rate is within the range of default rates charged in the commercial lending market at the relevant time. But Debtor's loan was not purely commercial. It was a construction loan on a single-family residence that was later packaged with commercial property. When asked about residential loans, Bierman offered no opinion, conceding that "they typically don't price them with a . . . default rate margin necessarily" and that it was difficult to compare residential and commercial loans. Hr'g Tr. 51:10–52:7. As a result, the Court gives little weight to Bierman's testimony that the range of default interest rates in the commercial lending market in 2010 was 4 percent to 15 percent. Bierman opined that late charges alone were insufficient to cover the risks and costs associated with a non-performing loan. That statement was merely conclusory. Again, Bierman provided very general testimony but failed to offer any analysis related to this case. No explanation was offered as to why the "Default Rate Margin" would reasonably forecast the damages expected to occur in the event of a breach by this borrower on this obligation. Nothing in the record shows how Bridgeview chose the default rate of interest. The Court is hard-pressed to conclude that the 16.25 percent figure represents a reasonable forecast of damages. The 10 percent "Default Rate Margin" is simply too high. It is not a reasonable charge because it compensates for an injury that has already been substantially compensated for in some other way under the Note, namely, through late charges and attorneys' fees.

Balancing the equities in this case, however, the Court finds that it would be inequitable to award no default interest to Burling Dickens. Debtor is solvent. The Plan proposes to pay all allowed unsecured claims in full. Debtor stands to receive proceeds from the sale of the Burling

8

Property. As a result, the Court finds that a "Default Rate Margin" of 4 percent (in addition to the pre-default contract rate of 6.25 percent) is reasonable in this case.

## Conclusion

Based upon the foregoing, the Court sustains the Objection, in part, and determines the appropriate default interest rate to be 10.25 percent. A separate order will be entered consistent with this Memorandum Opinion.

Dated: December 20, 2013

_____
Janet S. Baer
United States Bankruptcy Judge